# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 17-20358-CIV-ALTONAGA/O'SULLIVAN

VIOLETA PUGA,

        **Plaintiff,**

v.

NANCY A. BERRYHILL,
**Acting Commissioner of Social Security**
**Administration,**

        **Defendant.**

_____/

## **ORDER**

THIS MATTER is before the Court on the plaintiff's Motion for Summary Judgment (DE# 23, 10/05/2017), and the defendant's Motion for Summary Judgment (DE# 24, 11/06/2017). The plaintiff requests the final decision of the Commissioner of Social Security be reversed and Disability Insurance Benefits ("DIB") be granted under Title II of the Social Security Act ("SSA"). In the alternative, the plaintiff requests the final decision of the Commissioner of Social Security be vacated and the case be remanded for further administrative proceedings. The complaint was filed pursuant to the Social Security Act ("SSA"), 42 U.S.C. §405(g), and is properly before the Court for judicial review of a final decision of the Commissioner of the SSA. The parties consented to Magistrate Judge jurisdiction, (DE# 17, 07/17/2017), and this matter was reassigned to the undersigned pursuant to Judge Altonaga's Order dated July 17, 2017. (DE# 19, 07/18/2017). Having carefully considered the filings and applicable law, the undersigned enters the following Order.

## PROCEDURAL HISTORY

On February 20, 2013, Violeta Puga (hereinafter "the plaintiff") filed a DIB application under Title II of the SSA, 42 U.S.C. § 405(g). (Tr. 179). The plaintiff's application was initially denied on April 2, 2013, and was denied again on reconsideration on June 18, 2013. (Tr. 78-86, 88-98). The plaintiff requested a hearing in front of an administrative law judge ("ALJ") on August 6, 2013. (Tr. 111-12). The ALJ held a hearing on June 17, 2015. (Tr. 43-77). On August 7, 2015, the ALJ denied the plaintiff's application for disability insurance benefits. (Tr. 21-42). On September 24, 2015 the plaintiff filed an appeal to the Appeals Council requesting review of the ALJ's decision. (Tr. 20). The Appeals Council denied the plaintiff's request for review on November 30, 2015. (Tr. 1-4). On January 26, 2017, plaintiff filed this claim, pursuant to 42 U.S.C. § 405(g), seeking reversal of the Commissioner's final decision. (DE # 1, 1/26/2017). In the alternative, the plaintiff requests remand for further administrative proceedings. (*Id.*).

## FACTS[1]

The plaintiff was born on March 11, 1957, and was 54 years old on her alleged onset date of August 1, 2011. (Tr. 173). The plaintiff has, at most, a seventh grade education. (Tr. 52, 216). The plaintiff alleged disability based on diabetes mellitus, Meniere's disease (and associated hearing loss), anxiety, high cholesterol, and diabetic retinopathy. (Tr. 79). The plaintiff also has a history of obesity, hypertension, renal disease, obstructive sleep apnea, vertigo, and back pain. (Tr. 393-94, 405-06, 424, 448, 777).

---

[1] All references to "Tr." refer to the transcript of the Social Security Administration record filed on July 17, 2017. See, Social Security Transcripts (DE# 16, 07/17/2017). Moreover, the page numbers refer to those found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the Court's electronic docketing system or any other page numbers that may appear.

The plaintiff worked as a telemarketer in the past, however, she has not engaged in substantial gainful activity (SGA) since the alleged onset date of August 1, 2011. (Tr. 73, 178). FICA earnings show the plaintiff earned $17,977.00 in 2010 and $3,078.00 in 2011. (Tr. 179). The plaintiff earned $664.00 in 2012, which was below the SGA level for that year. (Tr. 54). In a Disability Report Form SSA-3368 dated February 20, 2013, the plaintiff reported that she worked from June 1993 to August 2011 as a telemarketer. (Tr. 196-99). In a section of the form for persons who held only one job in the last fifteen years, the plaintiff described her work: "Made outbound calls to businesses and tried to get them as customers for the company." (Tr. 200). Emil Esmurdoc of the Social Security Administration's Miami district office memorialized a June 18, 2013, phone interview with the plaintiff, where the plaintiff "stated that she worked in various locations, but in all of them she did the same type of work as a telemarketer. She used the phone and the phone book to locate potential clients and then she scheduled appointments for the sales team to go out and meet with them." (Tr. 220). The plaintiff told Mr. Esmurdoc this was the only work she had performed in the past fifteen years and he concluded, "Based on this description, the DOT title that best matches this job is : Telemarketer (DOT : 299 . 357- 01 4-- Sedentary/SVP3)." (*Id.*). Mr. Esmurdoc noted that the plaintiff "was able to hear the conversation [without] the need to raise my voice or to repeat myself." (*Id.*).

I. MEDICAL EVIDENCE

The plaintiff was diagnosed with diabetes mellitus (type II). (Tr. 405-07, 447-48, 467, 605-06). Doctors have recommended diets and prescribed medications to treat the plaintiff's diabetes, obesity, and related health problems. (Tr. 394, 425-27, 429, 439, 450, 482, 533, 692, 709). However, the plaintiff consistently failed to follow her recommended diet and her

medication fluctuated. (Tr. 294, 302, 319-20, 371, 424-28, 436, 447-49, 517, 556, 775). The plaintiff also claims the following impairments: Meniere's disease, vertigo, hearing loss, chronic obstructive pulmonary disease (COPD), kidney disease, back pain, foot pain, sleep apnea, and frequent need to urinate. (Tr. 50, 54, 62-62). Lab tests from 2013 to 2014 show that the plaintiff had high levels of Hemoglobin A1C, cholesterol, glucose, blood urea nitrogen (BUN), creatinine, triglycerides, microalbumin, hematocrit, white blood cells (WBC), aspartate aminotransferase (AST), thyroid-stimulating hormone (TSH), abnormal liver function tests (LFTs), and alanine aminotransferase (ALT). (Tr. 394, 448, 462-65, 474-76, 615, 647-49, 665-67). The plaintiff also had protein and blood in her urine, elevated liver enzymes, and vitamin D deficiency. (Tr. 340, 382, 394, 397, 399, 642-43).

On June 17, 2013, the Disability Determination Service's reviewing doctor, James Patty, M.D., determined that the plaintiff had a medium residual functional capacity (RFC) and the following Adult Medically Determinable Impairments: diabetes mellitus, essential hypertension, hyperlipidemia, vertiginous syndromes, and vestibular system disorders. (Tr. 92). Dr. Patty noted that the plaintiff reported a history of Meniere's disease, but that it was controlled and she had not had complications. (Tr. 95). Neurological tests were normal including: a negative Romberg test, a Fukuda stepping test within normal limits, no vertigo on a headshake test, a negative Dix-Hallpike test, and cerebellar cells within normal limits. (*Id.*). Dr. Patty found that the plaintiff's impairments could reasonably be expected to cause the alleged pain and symptoms but the plaintiff's statements were only partially credible. (Tr. 93). Dr. Patty concluded that the plaintiff's "[a]llegations of symptoms severity and fatigue are not consistent [with] objective evidence on file, including hospitalizations and treating source [medical evidence of

record].”(*Id.*). Dr. Patty determined that the plaintiff had exertional limitations preventing her from, for example, lifting more than 50 pounds or walking or sitting continuously for longer than six hours in an eight-hour workday. (*Id.*). Based on the plaintiff's alleged Meniere's disease, Dr. Patty suggested postural limitations, such as not climbing ladders and balancing only occasionally, as well as environmental limitations, like avoiding unprotected heights. (Tr. 94-95). Dr. Patty and Mr. Esmurdoc signed an assessment (on June 17 and June 18, 2015, respectively) determining that the claimant had the residual functional capacity (RFC) to perform past relevant work as a telemarketer at a sedentary exertional level. (Tr. 96-97).

A. Meniere's Disease and Hearing Loss

The plaintiff claims she was diagnosed with Meniere's disease more than thirty years ago and the record includes notes from multiple physicians who have either diagnosed the plaintiff with Meniere's disease or acknowledged the initial diagnosis. (Tr. 266, 291, 294, 405-06, 461, 605-06). The plaintiff reported frequent episodes of vertigo, lasting between five to ten minutes, causing vomiting, nausea, and loss of balance. (Tr. 265, 294, 392, 394, 461). Doctors advised the plaintiff to follow a low-salt diet and prescribed Antivert, but the plaintiff has not consistently followed either recommendation. (Tr. 266, 294, 394, 449).

On March 30, 2012, Xue Zhong Liu, M.D. treated the plaintiff for Meniere's disease and complaints of decreased hearing in her right ear, as well as constant ringing and possible tinnitus in both ears. (Tr. 291, 294, 295). Dr. Liu concluded that the plaintiff exhibited "poorly controlled recurrent vertigo" and symptoms "consistent with Meniere's disease" and requested an audiogram. (Tr. 295). On June 15, 2015, Dr. Liu reviewed an audiogram and determined that the plaintiff had hearing loss in both ears. (Tr. 271). On the left side, the plaintiff had "mild sloping

to moderate and sensory neural hearing loss" with a speech recognition threshold (SRT) of 25% and 100% recognition. (*Id.*). On the right side, the plaintiff had "moderate to severe sensorineural hearing loss" with SRT of 65% and 52% discrimination. (*Id.*). The plaintiff reported continued daily episodes of vertigo "suggestive of Tumarkin attacks."[2] (*Id.*).

On October 18, 2012, Seth Mitchell Lieberman, M.D. treated the plaintiff who reported recurring episodes of vertigo and tinnitus in both ears. (Tr. 265). Dr. Lieberman assessed that, although the plaintiff did not have any aural pressure or fluctuating hearing loss, the plaintiff had hearing loss (particularly on the right side) and experienced episodes "which sound [sic] like she has Tumarkin attack [sic] associated with Meniere's disease." (*Id.*). The plaintiff reported one episode of vertigo per month and occasional episodes which "appeared to be a Tumarkin attack." (*Id.*). The plaintiff was taking hydrochlorothiazide daily to treat the vertigo episodes and her symptoms had improved. (*Id.*). An MRI showed no tumors or retrocochlear. (*Id.*). The plaintiff had a negative Romberg test with no sway and a Fukuda stepping test within normal limits. (Tr. 266). The plaintiff's cerebral signs were normal and she exhibited no vertigo on a head-shake test and a Dix-Hallpike test. (*Id.*). Dr. Lieberman recommended that the plaintiff control her diabetes–which he described as "severely uncontrolled"–and speculated that fluctuations in the plaintiff's blood glucose level contributed to her imbalance and disequilibrium. (Tr. 265-66). Finally, Dr. Lieberman requested another audiogram and referred the plaintiff to the University of Miami for vestibular testing. (Tr. 266).

On August 16, 2013, Anish Y. Parekh, M.D. treated the plaintiff for vertigo and

---

[2]Tumarkin attacks (also known as "drop attacks") are "sudden spontaneous falls while standing or walking, with complete recovery in seconds or minutes." https://www.american-hearing.org/disorders/drop-attacks (last visited June 28, 2018).

Meniere's disease symptoms including tinnitus, hearing loss, and fullness in the ears. (Tr. 459).

Dr. Parekh diagnosed the plaintiff with Meniere's disease and asymmetrical sensorineural

hearing loss. (Tr. 461). Dr. Parekh noted that "audio [testing] today shows left [Sensorineural

Hearing Loss]" with "mixed loss on right" and discussed hearing amplification. (*Id.*).

B. Medical Treatment for Foot Problems

    From January 2013 to April 2014, the plaintiff visited the Florida Foot and Ankle Clinic

several times for treatment of foot pain associated with diabetes mellitus, including

onychomycosis and tinea pedis (two common forms of fungal infections)[3], and painful yellow toe

nails. (Tr. 369-76). Doctors at the clinic performed debridement procedures, and prescribed a diet

plan and diabetic shoes. (Tr. 344-45, 374, 893-96). On November 18, 2013, the plaintiff was

treated for "painful long deformed yellow 1-10 nails" and David Cantor, DPM observed that the

plaintiff was not complying with her diet and had uncontrolled diabetes. (Tr. 892). On August 15,

2014, and November 5, 2014, the plaintiff visited the Miami Institute for Joint Reconstruction

complaining of painful fungal nails. (Tr. 763, 904). Gary Goykman, OPM diagnosed the plaintiff

with onychomycosis, "hammer toes," diabetes mellitus, sciatica, and pes planus (flatfoot). (Tr.

763-65, 904). Dr. Goykman performed debridement procedures and prescribed shoes and cream

to reduce the plaintiff's discomfort. (Tr. 765, 904).

C. Retinopathy

    The plaintiff alleges that she suffers from diabetic retinopathy. (Tr. 82, 84, 88, 95). On

January 16, 2013, the plaintiff underwent a comprehensive eye care examination at Kendall Eye

---

[3] "Tinea pedis and onychomycosis are the most frequently occurring superficial fungal infections." http://www.podiatryinstitute.com/pdfs/Update_1997/1997_23.pdf (last visited June 19, 2017).

Institute after complaining of occasional obstruction in both eyes. (Tr. 364). Harry Hamburger, M.D. issued a prescription for new glasses and noted that the plaintiff was diabetic with "background retinopathy" and at risk of developing glaucoma. (Tr. 365-66).

## D. Sleep Apnea

From 2013 to 2015, the plaintiff was treated several times at Mezey & Krainson M.D. PA for difficulty sleeping. (Tr. 996, 1002, 1006-07, 1009-11, 1015-19). A polysomnogram revealed that the plaintiff suffered from obstructive sleep apnea (OPA) and James Krainson, M.D. assessed that the plaintiff's diabetes and hypertension were contributing factors. (Tr. 1002). On October 2, 2013, Dr. Krainson reviewed Continuous Positive Airway Pressure (CPAP) titration study results and prescribed a CPAP machine. (Tr. 1003-05). Although there was difficulty obtaining a mask that fit, by June 18, 2014, the plaintiff was "feeling improved" with no morning headaches and regularly used her CPAP machine. (Tr. 1012). On May 14, 2015, Dr. Krainson conducted a CT scan of the plaintiff and discovered a pulmonary nodule. (Tr. 1018-19).

## E. Back Pain

On October 30, 2014, Paul S. Fisher, DC treated the plaintiff for "acute discomfort and or paresthesia in the . . . left buttock, left pelvic and left sacroiliac." (Tr. 771). The following day, Dr. Fisher noted that "[m]ultiple subluxations with spasm, hypomobility and end point tenderness were found and adjusted." (Tr. 770). Dr. Fisher reviewed the x-rays and found, "osteoarthritic changes, generalized osteoporosis, foramina encroachment, rotational malposition, pelvic rotation high on the left, elongation of the transverse process and acquired spinal fusion." (*Id.*). Cervical x-rays revealed "rotational malposition, osteoarthritic changes, narrowed disc spacing and complete loss of normal curvature." (*Id.*). Dr. Fisher estimated that there was a 60%

chance that the plaintiff would need long-term treatment for these issues and "a 60 to 80% chance of long-term residuals" of the plaintiff's primary "musculoskeletal, orthopedic, and neurological complaints." (*Id.*).

On March 8, 2015, the plaintiff was diagnosed with a lumbar herniated disc at West Kendall Baptist Hospital. (Tr. 909-13). A CT scan of L1-2 showed "disc osteophyte complex associated with moderate to severe facet hypertrophy but no canal or foramina stenosis." (Tr. 972). The plaintiff's L2-3 had osteophyte complex with "multifactorial mild canal stenosis" and foramina. (*Id.*). A scan of L3-4 revealed a bulging disc consistent with facet hypertrophy resulting in "multifactorial mild canal narrowing" and "mild foramina narrowing bilaterally." (*Id.*). The plaintiff's L4-5 revealed a "disc bulge associated with left paracentral extruded disc." (*Id.*). L4-5 had "multifactorial mild to moderate canal stenosis and mild foramina narrowing bilaterally." (*Id.*). L5-S1 showed "minimal disc osteophyte complex associated with moderate to severe facet hypertrophy" and the plaintiff's uterus had dystrophic calcifications. (Tr. 973). On March 13, 2015, Dr. Jimenez diagnosed the plaintiff with lumbar disc myelopathy. (Tr. 777).

F. Abdominal Pain and Respiratory Difficulties

The plaintiff has a history of gastritis. (Tr. 351, 361, 364, 909, 928, 996, 1003). On November 6, 2012, the plaintiff visited the emergency room complaining of abdominal pain and was diagnosed with acute gastritis. (Tr. 479, 492). On July 17, 2013, Juan Orozco, M.D. treated the plaintiff for abdominal pain and diagnosed her with hyperlipidemia, unspecified essential hypertension, and hypertensive disorder. (Tr. 466-67). On July 24, 2013, Jerry Martel, M.D. of Gastro Health diagnosed the plaintiff with epigastric pain and pain in both upper quadrants. (Tr. 469-71). That same day, testing at South Florida Diagnostic Imaging revealed fatty infiltration of

the liver and a renal simple cyst on the left kidney. (Tr. 473).

On June 12, 2014, the plaintiff was admitted to the emergency room complaining of a cough and shortness of breath. (Tr. 604). Giovanna Isabel Alva-Henriquez, M.D. diagnosed the plaintiff with COPD exacerbation, elevated D-dimer, Meniere's disease, dyslipidemia, and anemia, and prescribed intravenous steroids and respiratory treatments. (Tr. 605-06). Radiologic testing of the plaintiff showed "mild coarsening of intestinal markings" in the plaintiff's lungs. (Tr. 625). Tests also revealed "[p]eribronchial thickening and areas of groundglass attenuation within the lungs." (Tr. 628). The Report of Radiologic Consultation noted, "[t]hese imaging findings are concerning for an infectious of inflammatory process of the airways." (*Id.*). On June 16, 2014, Francisco Pons, M.D. of Kidney Treatment & Hypertension Associates, P.A. diagnosed the plaintiff with chronic kidney disease (stage II), diabetic nephropathy, hyperuricemia, hematutia, obesity, vitamin D deficiency, proteinuria, and mixed hyperlipidemia. (Tr. 642-43). A radiologic consultation on March 8, 2015 revealed a cyst on the plaintiff's right kidney and hepatic steatosis (fatty liver). (Tr. 978). On April 2, 2015, the plaintiff reported to the emergency room complaining of chest pain and was diagnosed with a urinary tract infection and hyperglycemia. (Tr. 947, 951).

III. The Plaintiff's Testimony

The plaintiff testified at a hearing held before an administrative law judge (ALJ) on June 17, 2015. (Tr. 45). The ALJ twice instructed the plaintiff to speak, to which the plaintiff responded, "Well, the thing is, my – is that I cannot hear.  You know, this one is – I'm completely deaf in this one, and this one is borderline." (Tr. 52). The plaintiff testified that she attended school in Lima, Peru but only completed "six or seven" grades. (*Id.*). The plaintiff stated

that she last worked "[p]robably couple of years ago . . . probably in 2011, 2010." (*Id.*). The plaintiff also testified that she has worked only in telemarketing and sales since 1993. (Tr. 52-53). The ALJ noted that the plaintiff earned $664.00 in 2012 and asked the plaintiff for an explanation. (Tr. 53). The plaintiff testified that she could not recall working in 2012 but suggested the earnings were "probably some commissions." (*Id.*). When the ALJ indicated that the earnings were classified as self-employment earnings, the plaintiff explained that her husband had a company and he probably gave her some money. (*Id.*). The plaintiff testified that her husband prepares the couple's taxes. (Tr. 54). The ALJ noted that the $664.00 was below the minimum for substantial gainful activity (SGA). (*Id.*).

The plaintiff explained that she attempted to obtain telemarketing and sales work but she was unsuccessful because she needed to go to the bathroom "each minute, day and night, 24 hours." (Tr. 54-55). The plaintiff further testified that when she put a phone to her right ear, "I cannot hear nothing, nothing at all." (Tr. 54). The plaintiff then stated, "[a]nd this one is borderline," presumably referring to hearing in her left ear. (*Id.*). The plaintiff testified that she was unable to obtain work because her Meniere's disease causes her to fall down and "get dizzy a lot." (*Id.*). The plaintiff explained that her dizziness and vertigo symptoms can occur "anytime, anywhere," but she was able to drive sometimes without medical incident. (Tr. 54-55). The plaintiff claimed telemarketing employers would not hire her because of her need to use the bathroom "each minute" and her inability to hear and sales employers "don't want anybody, you know, old." (Tr. 55). The plaintiff testified that her diabetes caused her to need to use the bathroom "[d]ay and night." (*Id.*). The plaintiff stated she does not use urine-protective pads and has not had any "accidents." (*Id.*). On cross examination, plaintiff elaborated that in an eight-hour

work day she needed to use the bathroom "probably 10 times to 12." (Tr. 56).

The plaintiff testified that she experienced "horrible" back pain, which made it difficult for her to sit or stand. (Tr. 57-58). The plaintiff claimed that her back pain limited her ability to sit to less than one hour before she would need to stand and she was only able to stand for half an hour. (Tr. 58). The plaintiff stated that she was not "supposed to take any medicines" because of her liver and kidney problems, but she took Motrin to alleviate her back pain. (Tr. 57).

IV. Medical Examiner (ME) Testimony

The ALJ examined the medical expert, Oscar Farmati, M.D. at the hearing held on June 17, 2015. (Tr. 43, 60-68). Dr. Farmati testified that he listened to the plaintiff's testimony and reviewed the medical evidence (F1-F19). (Tr. 61). Dr. Farmati testified that the plaintiff's metabolic issue was "dominating the picture" and she had a "very elevated BMI" estimated at more than twenty. (Tr. 61-62). Dr. Farmati testified that the plaintiff had diabetes mellitus and that the diabetes was uncontrolled possibly due to a compliance issue. (Tr. 62). Dr. Farmati also concluded, "the whole issue [with the plaintiff's liver] is involving the problem of the fatty liver." (*Id.*). Dr. Farmati noted that the plaintiff had "persistent microalbuminuria in her urine" indicating possible early stage-one chronic kidney disease. (*Id.*). Dr. Farmati acknowledged that the plaintiff "has some exertional dyspnea" and uses a CPAP machine for her obstructive sleep apnea, but there was "no evidence of deoxygenation or arrhythmias." (*Id.*).

Dr. Farmati noted that the plaintiff was diagnosed with Meniere's disease, but that "her Meniere is . . . on-and-off." (Tr. 63). Dr. Farmati was unfamiliar with Tumarkin syndrome and explained, "I don't know what that is. I looked up everywhere, and I couldn't find it." (*Id.*). Dr. Farmati noted that the plaintiff's "Romberg is negative, and there is no other neurologic signs

present. Neurologically, clinically besides the dizziness was not documented in the autonomic signs." (*Id.*). Dr. Farmati acknowledged that he did not have documentation of the plaintiff's back problems, but concluded based on "everything in totality" that the plaintiff had functional limitations. (Tr. 64). Dr. Farmati stated that he could not find an audiometric test in the records and thus could not could not determine the degree of plaintiff's hearing loss. (Tr. 67-68). The medical expert described at length the numerous functional limitations which the ALJ adopted in the RFC finding. (Tr. 66-68).

V. Vocational Expert (VE) Testimony

The ALJ examined VE Charles Lorin Lovely on June 17, 2015. (Tr. 43, 72-76). The VE testified that in the fifteen years prior to the hearing the plaintiff had worked as a telemarketer with a Specific Vocational Preparation rating of three and "the exertional level of sedentary." (Tr. 73). The ALJ posed a hypothetical to the vocational expert mirroring the plaintiff's age, education, and work experience. (*Id.*). The ALJ further stipulated that the hypothetical individual had numerous functional limitations–restrictions on physical exertions, workplace conditions, and mobility–based on the ME testimony and the evidence. (Tr. 73-74). The VE concluded that the hypothetical individual would be able to perform the plaintiff's past work as a telemarketer under those restrictions. (Tr. 73).

On cross examination by the claimant's attorney, the VE testified that there would be no jobs available for the aforementioned hypothetical individual if the individual was unable to work "at least 15 percent of the workday due to their need to make trips to the bathroom." (Tr. 74). The ALJ's hypothetical did not include hearing loss limitation and the plaintiff's attorney asked the vocational expert whether an individual with past relevant work as a telemarketer who

"suffered severe hearing loss in one of the two ears" would be able to still work as a telemarketer. (Tr. 75). The VE answered that if the individual was able to hear and hold a conversation "that person would still be able to maintain and do that previous occupation." (*Id.*). The attorney requested to have the plaintiff examined by an audiologist but the ALJ responded, "I don't think that's necessary . . . largely due to my observation today, you know, and the ability to hear and respond to questions . . . No mention of hearing aids. Adjustments can be made to telephones." (*Id.*). The ALJ allowed the attorney to submit additional evidence within fourteen days and concluded the hearing. (Tr. 76).

## THE ALJ'S DECISION-MAKING PROCESS

"Disability" is defined as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can last for a continuous period of not less than twelve months . . ." 42 U.S.C. §§ 416(I), 423(d)(1) (2015); 20 C.F.R. § 404.1505 (2012). The impairment must be severe, such that the plaintiff is unable to perform past relevant work "or any other substantial gainful work that exists in the national economy." 20 C.F.R. § 404.1505-1511 (2012).

The ALJ must apply a five-step analysis to determine whether the claimant is entitled to disability benefits. 20 C.F.R. § 404.1520(a)-(f) (2012). At the first step, the ALJ considers whether the claimant is currently engaging in substantial gainful activity; if so, the ALJ will make a non-disability determination. 20 C.F.R. § 404.1520(b). Second, the ALJ must determine whether the claimant suffers from a severe impairment or a combination of impairments. 20 C.F.R. § 404.1520(c). If the claimant does not, then a finding of non-disability is made and the inquiry ends. Third, the ALJ compares the claimant's severe impairments to those in the listings

of impairments located in Code of Federal Regulations, Part 404, Subpart P, Appendix I. 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526. Certain impairments are so severe, whether considered alone or in conjunction with other impairments, that if such impairments are established, the regulations require a finding of disability without further inquiry into a claimant's ability to perform other work. *See Gibson v. Heckler*, 762 F.2d 1516, 1518 n.1 (11th Cir. 1985). Fourth, the ALJ must determine whether the claimant has the "residual functional capacity" (RFC) to perform his or her past relevant work. 20 C.F.R. § 404.1520(f). "Residual functional capacity" is "the most you can still do despite your limitations." 20 C.F.R. § 404.1545(a). This determination takes into account "all relevant medical and other evidence," including the claimant's testimony and the observations of others. *Id.* If the claimant is unable to perform his or her past relevant work, then a prima facie case of disability is established and the burden of proof shifts to the Commissioner to show at the fifth step that there is other work available in the national economy that the claimant can perform. 20 C.F.R. § 404.1520(e)-(g); *see Barnes v. Sullivan*, 932 F.2d 1356, 1359 (11th Cir. 1991) (finding the claimant bears the initial burden of proving she is unable to perform previous work). Fifth, if the claimant cannot perform past relevant work, the ALJ decides whether the claimant is capable of performing any other work in the national economy. 20 C.F.R. § 404.1520(g).

## THE ALJ'S FINDINGS

At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since the alleged onset date. (Tr. 29). Although the plaintiff worked in 2012 (after the alleged onset date), the ALJ found that this was not substantial gainful activity because the earnings were less than the monthly limit for that year. (*Id.*). At step two, the ALJ determined

15

that the plaintiff had the following severe impairments: "hearing loss, Meniere's disease, diabetes mellitus, obesity, renal disease, obstructive sleep apnea, and lumbago." (Tr. 29, 35).

At step three, the ALJ concluded that the plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (Tr. 29). The ALJ accorded "significant weight" to the testimony of Dr. Farmati, "as it was offered in an area of his expertise" and "consistent with the medical evidence of record." (Tr. 32). After reviewing the medical record and the plaintiff's testimony, the ME testified that the plaintiff did not meet or equal any Appendix 1 listings. (Tr. 30-31). The ALJ considered the plaintiff's weight, height, and body mass index and made an individual assessment that the plaintiff was obese. (Tr. 30). While the plaintiff's obesity causes "mild functional limitations," the ALJ concluded that plaintiff's obesity combined with her other impairments "causes more than mild limitations in work related functioning." (*Id.*). Accordingly, the ALJ limited the plaintiff to a range of sedentary work. (*Id.*).

The ALJ observed that the plaintiff was consistently diagnosed with diabetes mellitus which was uncontrolled "probably due to compliance issues." (Tr. 31). The ALJ noted that the plaintiff's physicians did not mention associated complications, her physical and neurological examinations were "generally unremarkable," and "with consistency" the plaintiff failed to comply with doctor-recommended diet and exercise plans or follow prescribed medical dosages. (*Id.*). According to the ALJ, the plaintiff's non-compliance explained why her "glucose levels were generally high." (*Id.*).

The ALJ found that the plaintiff suffered from respiratory issues suggesting "some exertional dyspnea" and she was diagnosed with obstructive sleep apnea (OSA) requiring the use

of a CPAP machine. (*Id.*). Nevertheless, the ALJ found "no evidence of deoxidation or arrhythmia." (*Id.*).

With regard to the plaintiff's alleged hearing loss, the ALJ noted that the plaintiff reported "subjective complaints of left sided hearing loss and limited hearing in the right." (*Id.*). The ALJ also observed that the plaintiff's Romberg tests were normal and "apart from some indications of dizziness, there were no neurological anatomic signs documented." (*Id.*). The ALJ stated that "[t]here were [sic] no audiometric finding in the medical record" and the record "only indicated a decreased severity on the left [side] and a minor decrease on the right [side]." (*Id.*). The ALJ noted that an audiometric test was requested but "there is no indication that this was conducted or that the [plaintiff] followed through." (*Id.*). Thus, the ALJ concluded "[t]here is no specification of how much loss [the plaintiff] may have." (*Id.*). The ALJ stated that the only evidence of Meniere's disease in the record at the time of the hearing was the plaintiff's report to Dr. Parekh. (*Id.*). The ALJ found that, contrary to Dr. Farmati's opinion, there was objective medical evidence in the record showing the plaintiff was diagnosed with a disc herniation on March 13, 2015. (Tr. 32).

In assessing the plaintiff's functional limitations, the ALJ relied on Dr. Farmati's testimony describing the plaintiff's medical conditions and their impact on her functional capacity. (*Id.*). The ALJ recalled that the plaintiff "was able to participate in the hearing for approximately one hour and did not require a bathroom break." (*Id.*). The ALJ acknowledged that the plaintiff "had required some foot care treatment . . . due to painful toenails; however, [Dr. Farmati] opined this did not impede her ability to use her feet frequently (Ex 6F)." (*Id.*). The ALJ again noted that there was not an audiometric finding in the medical record and therefore

neither the ALJ nor the medical expert could specify the extent of plaintiff's hearing loss. (*Id.*).

At the fourth step, the ALJ considered the entire record and concluded that the plaintiff had "the residual functional capacity to perform the full range of sedentary work as defined in 20 CFR 404.1567(a)." (Tr. 32-33). The ALJ determined that the plaintiff:

> . . . can lift, carry, push and/or pull 15 pounds occasionally and 10 pounds frequently. She can sit for up to six hours in an eight-hour workday with normal breaks; however, she would need close proximity to the bathroom. She can stand and/or walk for two hours in an eight-hour workday. She can occasionally climb ramps and stairs but never ladders or scaffolds. She can occasionally stoop, kneel, crouch, and crawl. She can never balance. She should avoid unprotected heights and no commercial driving. She can have occasional exposure [sic] concentrated humidity and wetness. She should avoid concentrated exposure to dust, fumes, odors, and pulmonary irritants. She should also avoid occasional exposure to extreme heat and extreme cold. She is limited to occasional operation of foot control and occasional exposure to heavy vibrations. (*Id.*).

The ALJ concluded that "the claimant is not as limited as alleged and retains the ability to work at the residual functional capacity set forth above." (Tr. 34). The ALJ scrutinized the plaintiff's claim that she was unable to work because of her need to use the bathroom frequently, noting "I noticed that [the plaintiff] participated in the hearing for approximately one hour and did not require any breaks for bathroom use" and "does not use urine-containing pads." (Tr. 33). The ALJ noted that, although the plaintiff alleged she was unable to work due to hearing loss, the plaintiff "was well engaged during the hearing and answered the questions asked without significant difficulties." (*Id.*). The ALJ also observed that the plaintiff occasionally drives, even though she testified that she suffered from dizziness and vertigo. (*Id.*). Although the plaintiff suffers from back pain, the ALJ observed that the plaintiff's pain was "sometimes alleviated when she uses a patch or with Motrin." (Tr. 34). The ALJ concluded that the plaintiff's impairments "could reasonably be expected to cause the alleged symptoms," but the plaintiff's

statements "concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (*Id.*). The ALJ acknowledged that additional exhibits were submitted after Dr. Farmati reviewed the record; however, "the new evidence not reviewed by Dr. Farmati, does not demonstrate that the claimant has a disabling condition . . . it is evident that [the plaintiff] retains the ability to work at the sedentary level." (*Id.*).

The ALJ reviewed post-hearing evidence supporting the plaintiff's hearing loss and Meniere's disease claims. (Tr. 35). A treatment note from the plaintiff's October 18, 2012 appointment with Dr. Lieberman described hearing loss in both ears, particularly severe on the right side. (*Id.*). Dr. Lieberman also noted the plaintiff's claims of monthly vertigo episodes and indicated the episodes appeared to be Tumarkin attacks. (*Id.*). Dr. Lieberman noted that the plaintiff was taking hydrochlorothiazide and her condition had improved. (*Id.*). The ALJ acknowledged that Dr. Lieberman reviewed an audiogram which "showed a left-sided hearing loss that was mild sloping to moderate sensorineural hearing loss. On the right side, [the plaintiff] has a moderate-to-severe sensorineural hearing loss, and her SRT was 65 on the right side with 52% discrimination, 25% on the left side with 100% discrimination." (*Id.*). The ALJ noted that examinations showed the plaintiff:

> . . . had a negative Romberg test. Fukuda stepping test was within normal limits. Although, she felt a little bit unsteady, there was no sway. She has no spontaneous or gaze nystagmus. She had no nystagmus or vertigo on headshake test. She had a negative Dix-Hallpike test. There was no nystagmus or vertigo. Her cerebellar signs were within normal limits. Finger-to-nose as well as the stepping test was within normal limits and she had no arm drift. (*Id.*).

The ALJ concluded that the plaintiff's hearing on her right ear "was worse than her left" and she "had high-pitched tinnitus . . ." (*Id.*). The ALJ also considered a July 22, 2015, audiometric test,

which showed the plaintiff's "SRT was 60 on the right with 55% discrimination, and 25% on the left." (*Id.*).

The ALJ found that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (*Id.*). The ALJ also found that although the plaintiff "has been diagnosed with Meniere's disease, obesity, renal disease, obstructive sleep apnea, and lumbago . . . the physical examinations were generally unremarkable, including the neurological examinations." (*Id.*). The plaintiff complained of frequent urination, however the ALJ suggested the plaintiff "may be exaggerating regarding her allegations of bathroom use" because the plaintiff did not use urine-collecting pads and she "participate[d] in the hearing for approximately one hour without any bathroom breaks." (Tr. 36). With respect to the plaintiff's hearing loss, the ALJ noted that an audiogram "showed a left-sided hearing loss that was mild sloping to moderate sensorineural hearing loss (Ex 25F). An updated audiogram report showed very little difference in her right ear SRT values and none on the left (Ex 26F at 5)." (*Id.*). The ALJ concluded, "the claimant's impairments are severe; however, no [sic] disabling" and limited the plaintiff to sedentary work. (*Id.*).

The ALJ found "that no treating source has offered an opinion on this case." (*Id.*). The ALJ gave "significant weight" to Dr. Farmati's opinion and "adopted his opinion regarding the claimant's limitations in the residual functional capacity set forth above." (*Id.*). The ALJ accorded "some weight" to the Disability Determination Services reviewing physician's opinion that the plaintiff had the ability to work but "little weight to his opinion that the [plaintiff] could do so at the medium exertional level . . ." (*Id.*).

The ALJ concluded that the plaintiff was "capable of performing past relevant work as a

telemarketer. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565)." (Tr. 36-37). The ALJ noted that the plaintiff's past relevant work as a telemarketer is defined under the Dictionary of Occupational Titles "as sedentary in exertion." (Tr. 36). The ALJ agreed with the VE, who "testified that a hypothetical individual with the same age, education, and experience as the claimant and who possessed the residual functional capacity set forth in paragraph five above would be able to perform the claimant's past work as a telemarketer." (Tr. 36-37). The ALJ concluded that "claimant is able to perform her past relevant work as actually and generally performed" and she "is not disabled under sections 216(I) and 223(d) of the Social Security Act." (*Id.*).

## STANDARD OF REVIEW

The Court must determine if it is appropriate to grant either party's motion for summary judgment. Judicial review of the factual findings in disability cases is limited to determining whether the record contains substantial evidence to support the ALJ's findings and whether the correct legal standards were applied. 42 U.S.C. § 405(g) (2018); *See Wolfe v. Chater*, 86 F.3d 1072, 1076 (11th Cir. 1996) (holding that the reviewing court must not re-weigh evidence or substitute its discretion). On judicial review, decisions made by the defendant, the acting Commissioner of Social Security, are conclusive if supported by substantial evidence and if the correct legal standards were applied. 42 U.S.C. § 405(g); *See Kelley v. Apfel*, 185 F.3d 1211, 1213 (11th Cir. 1999). Substantial evidence is more than a "mere scintilla," such that a reasonable person would accept the relevant evidence as adequate to support a conclusion. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *See Richardson v. Perales*, 402 U.S. 389, 401

(1971). In determining whether substantial evidence exists, "the district court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the decision." *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995).

This restrictive standard of review, however, applies only to findings of fact. No presumption of validity attaches to the Commissioner's conclusions of law, including the determination of the proper standard to be applied in reviewing claims. *See Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991) ("The Secretary's failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal."); *accord Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The reviewing court must be satisfied that the Commissioner's decision is grounded in the proper application of the appropriate legal standards. *Davis v. Shalala*, 985 F.2d 528, 531 (11th Cir. 1993). The court may not, however, decide facts anew, re-weigh evidence or substitute its judgment for that of the ALJ, and even if the evidence weighs against the Commissioner's decision, the reviewing court must affirm if the decision is supported by substantial evidence. *See Miles v Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996); *See also Baker v. Sullivan*, 880 F.2d 319, 321 (11th Cir. 1989). Factual evidence is presumed valid, but the legal standard applied is not. *See Martin*, 894 F.2d at 1529. The Commissioner must apply the correct legal standard with sufficient reasoning to avoid reversal. *Id.*

## LEGAL ANALYSIS

The plaintiff argues she is entitled to judgment as a matter of law reversing the ALJ's final decision of August 7, 2015, and awarding disability benefits. The plaintiff argues that summary judgment must be granted because the decision was "not based on substantial evidence

and contains reversible errors of law . . ." (DE# 23, 10/05/2017 at 1). The plaintiff alleged four

issues: (1) the ALJ erred in determining that the plaintiff's work as a telemarketer constituted

past relevant work; (2) the ALJ failed to develop the record regarding the plaintiff's substantial

gainful activity; (3) the ALJ and the medical expert failed to properly consider the plaintiff's

Meniere's disease, hearing loss, and Tumarkin episodes when determining the residual functional

capacity; and (4) the ALJ erred in failing to consider the combined effects of the plaintiff's

impairments. *Id.*

## I.  THE ALJ DID NOT ERR IN DETERMINING THAT THE PLAINTIFF PERFORMED PAST RELEVANT WORK AS A TELEMARKETER.

### *A.  The Plaintiff Failed to Demonstrate That Her Work Experience Was Not Past Relevant Work*

The ALJ applied the correct legal standards substantiated by the evidence to determine

that plaintiff performed past relevant work as a telemarketer. Past relevant work is work that was

substantial gainful activity (SGA), lasted long enough for the claimant to learn the job, and was

performed within the past fifteen years. 20 C.F.R. § 404.1560(b). The claimant bears "the burden

of showing that certain work experience is not past relevant work." *Barnes*, 932 F.2d at 1359.

The plaintiff's motion concedes that the 1999, 2000, and 2010 earnings rose to the level

of SGA. (DE# 23, 10/05/2017 at 17).[4] However, the plaintiff argues that the ALJ was obligated

to inquire at the hearing whether the earnings during those years were from self-employment

income. The plaintiff argues that she has not worked as a telemarketer "in the competitive job

---

[4]The plaintiff contends that the 2012 earnings were below SGA levels. (DE# 23, 10/05/2017 at 19). To this point, the plaintiff, the ALJ, and the undersigned agree. The ALJ stated both in the hearing and in the decision that the 2012 earnings were below the monthly limit for SGA. (Tr. 54). This issue is immaterial, however, because the ALJ correctly found substantial evidence that the plaintiff performed SGA in 2010 as a telemarketer. (Tr. 36).

market since the year 2000 . . . as evidenced by [the plaintiff's] earnings record which was a part of the record at the time of the hearing." (*Id.* at 18.). The earnings record shows that the plaintiff earned $17,977.00 in 2010 from self-employment and the plaintiff contends that the ALJ should have inquired into this work because it was performed for her husband's business "under special conditions." (*Id.* at 17.). The defendant argues that the ALJ properly determined that the plaintiff was capable of performing her past relevant work as a telemarketer and the plaintiff has not demonstrated otherwise. (DE# 24, 11/06/2017 at 8-11).

The ALJ identified substantial evidence in the record supporting her finding that the plaintiff performed past relevant work as a telemarketer. In making the past relevant work determination, the ALJ properly relied on the VE's opinion, the plaintiff's testimony, notes from Social Security Administration interviews with the plaintiff, and the FICA earnings in the record. (Tr. 36). When the plaintiff applied for disability in 2013, she reported working as a telemarketer from June 1993 to August 2011 and a Social Security Administration employee concluded that this was the only occupation the plaintiff held during that time period. (Tr. 196-99, 220). At the hearing, the VE testified to the plaintiff's past fifteen year work history: "[t]he claimant was a telemarketer, and that DOT is 299.357-014 with the exertional level of sedentary and an SVP of 3." (Tr. 72-73). The plaintiff testified at the hearing that she last worked in telemarketing and sales "probably in 2011, 2010." (Tr. 52). This testimony was consistent with the plaintiff's FICA earnings which show she earned $17,977.00 in 2010 and $3,078.00 in 2011. (Tr. 179). In 2010, the non-blind maximum monthly SGA amount was $1,000.00.[5] If a claimant earned substantial

---

[5] Substantial Gainful Activity monthly limits. https://www.ssa.gov/oact/cola/sga.html (last visited June 19, 2018).

earnings working, "[g]enerally . . . we will find that you are able to do substantial gainful activity. 20 C.F.R. § 404.1574.

The plaintiff argues that her work in 2010 was performed under "special or sheltered work" environments outside a competitive job market and therefore should not be considered past relevant work. (DE# 23, 10/05/2017 at 19-20). In considering the claimant's work history for substantial gainful activity, the "primary consideration" will be any earnings derived from the work activity. 20 C.F.R. § 404.1574; *see also Johnson v. Sullivan*, 929 F.2d 596, 598 (11th Cir. 1991) (earnings reported on income tax returns raise a rebuttable presumption that the individual was gainfully employed). The Social Security Administration relies on the reported earnings "to determine whether you have done substantial gainful activity unless we have information from you, your employer, or others that shows that we should not count all of your earnings." *Id.*

The plaintiff argues that she performed "sheltered" work for her husband's cleaning business. (DE# 23, 10/05/2017 at 19-20). Sheltered work "is provided for handicapped individuals in a protected environment under an institutional program," such as working in a sheltered workshop. *SSR 83–33*. A sheltered workshop, as defined by federal statute, is a facility operating at a loss or receiving government aid. *See* 20 C.F.R. §§ 404.1574(a)(3), 416.974(a)(3). The plaintiff has not established that work performed for her husband's business was sheltered work. *See Green v. Comm'r, Soc. Sec. Admin.*, 555 F. App'x 906, 908 (11th Cir. 2014) (claimant failed to show employment in a county clerk's office constituted sheltered work). Even if the work in 2010 was sheltered, the earnings "from work you have done (regardless of whether it is unsheltered or sheltered work) may show that you have engaged in substantial gainful activity. Generally, if you worked for substantial earnings, we will find that you are able to do substantial

gainful activity." 20 C.F.R. § 404.1574(a)(1). There is no evidence in the record showing that the plaintiff did not work as a telemarketer in 2010 or that this work was done with special conditions that would have changed the ALJ's SGA assessment. To the contrary, there is strong and compelling evidence in the record from the plaintiff's testimony, her attorney's testimony at the hearing, the FICA earnings, and documented reports with the SSA that the plaintiff has past relevant work experience as a telemarketer. The undersigned agrees with the ALJ's determination that the plaintiff has past relevant work as a telemarketer.

*B. The Plaintiff Has Not Shown Good Cause for Failing to Submit the Affidavit of Orlando Puga at the Administrative Level and the Affidavit is Immaterial*

The plaintiff attached to the Motion for Summary Judgment an affidavit dated October 4, 2017, from the plaintiff's husband, Orlando Puga, testifying that the plaintiff "has not worked full time as a telemarketer since approximately 1999." (DE# 23-1, 10/05/2017). The affidavit was not reviewed by the ALJ or the Appeals Council and was submitted for the first time with the plaintiff's brief to this Court. "With a few exceptions," a claimant may "present new evidence at each stage of this administrative process." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1261 (11th Cir. 2007); *See also,* 20 C.F.R. § 404.900(b). For the purposes of determining whether a remand is warranted under sentence six of 42 U.S.C. Section 405(g), a reviewing court "may at any time order additional evidence to be taken before the Commissioner of Social Security," but only if the new evidence is material and "there is good cause for the failure to incorporate such evidence into the record in the prior proceeding." 42 U.S.C. § 405(g); *see Cherry v. Heckler*, 760 F.2d 1186, 1193 (11th Cir. 1985); *See also, Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986) (applying the "*Cherry* standard" that evidence must be new,

26

noncumulative, and material, and there was good cause for failing to previously submit the evidence).

The defendant argues that this Court must not consider the affidavit because the plaintiff has not proven that the evidence is material and that there was good cause for failing to submit the affidavit at the administrative level. (DE# 24, 11/06/2017 at 10-11). The plaintiff contends that Mr. Puga's testimony is relevant to the claim because the plaintiff testified at the hearing that her husband prepares her tax filings. (DE# 23, 10/05/2017 at 18). The plaintiff does not explain why Mr. Puga did not testify to the plaintiff's work history at the administrative hearing, only that he "was not offered the opportunity to testify at his wife's hearing . . ." *Id.*

The affidavit is immaterial and the plaintiff has not met her burden of proving good cause for failing to submit the evidence at the administrative level. The plaintiff has not established good cause because she failed to provide any evidence showing that the affidavit could not have been obtained and submitted before October 2017. Further, the affidavit is immaterial because there is not a reasonable possibility that the new evidence would change the outcome. *See Hyde v. Bowen*, 823 F.2d 456, 459 (11th Cir. 1987) (finding evidence is material if "there is a reasonable possibility that the new evidence would change the administrative outcome."). Mr. Puga's claim that the plaintiff has not worked as a telemarketer since 1999 is substantially contradicted by the record. The ALJ's determination that the plaintiff performed past relevant work as a telemarketer was based on the plaintiff's testimony, Social Security Administration interview notes, and the FICA earnings in the record. (Tr. 36).

II.  THE ALJ ADEQUATELY CONSIDERED THE PLAINTIFF'S MENIERE'S DISEASE
BUT FAILED TO CONSIDER THE PLAINTIFF'S HEARING LOSS IN FORMING THE RFC

The ALJ found that the plaintiff had the "residual functional capacity to perform the full range of sedentary work as defined in 20 CFR 404.1567(a)." (Tr. 32). Residual functional capacity is "the most you can still do despite your limitations." 20 C.F.R. § 404.1545(a)(1). At the hearing level, the ALJ is responsible for determining the claimant's RFC. 20 C.F.R. § 404.1546(c). The ALJ must consider all "medically determinable impairments" in assessing the claimant's RFC. 20 C.F.R. § 404.1545(a)(2); *see also Gibson*, 779 F.2d at 623 ("Clearly, the ALJ must consider every impairment alleged."). The claimant is responsible for providing the evidence which the ALJ considers in forming the RFC finding. 20 C.F.R. § 404.1545(a)(3). However, the ALJ must develop the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort" to assist the claimant in procuring medical reports. *Id.* The ALJ also considers abilities affected by impairments, including hearing and environmental restrictions, which may reduce the claimant's RFC. 20 C.F.R. § 404.1545(d). Finally, the ALJ considers "total limiting effects" from severe impairments which may not meet or equal a listed impairment but nevertheless impact the claimant's RFC. 20 C.F.R. § 404.1545(e).

*A. The ALJ Adequately Considered the Plaintiff's Meniere's Disease*

In assessing the plaintiff's RFC, the ALJ applied the correct legal standards and took into consideration the plaintiff's Meniere's disease when limiting the plaintiff to a range of sedentary work based on the evidence in the record. *See* 20 C.F.R. § 404.1545(a)(3). An ALJ assesses the plaintiff's ability to perform her past relevant work at step four or other work at step five by

considering the plaintiff's RFC. *See* 20 C.F.R. § § 404.1520(e), 404.1527(d)(2) (stating that the ALJ has final responsibility for determining a claimant's RFC). The plaintiff argues that the ALJ's RFC finding failed to account for the plaintiff's Meniere's disease and associated symptoms of vertigo and Tumarkin episodes. (DE# 23, 10/05/2017 at 21). The defendant argues that the ALJ reviewed all available evidence, which did not show that the plaintiff was more limited than the ALJ found. (DE# 24, 11/06/2017 at 11).

Contrary to the plaintiff's claim that "there is essentially no discussion about [the plaintiff's] limiting effects of . . . Meniere's disease in the ALJ Decision,"(DE# 23, 10/05/2017 at 21) the ALJ's decision acknowledged that the plaintiff was diagnosed with Meniere's disease, reported regular episodes of vertigo, and occasionally experienced "what appeared to be a Tumarkin attack." (Tr. 35). The ALJ noted that at the time of the hearing the only evidence of the plaintiff's Meniere's disease was the plaintiff's visit with Anish Y. Parekh, M.D. (Tr. 31). However, the ALJ reviewed the entire record, which included additional medical evidence beyond what was available at the hearing. For example, the record included the plaintiff's visit with Dr. Liu where she reported experiencing daily vertigo episodes which "sound like Tumarkin attacks associated with Meniere's disease." (Tr. 271-72). The ALJ also cited the plaintiff's visit with Dr. Lieberman, who noted the plaintiff's episodes seemed "like she has Tumarkin attack [sic] associated with Meniere's disease," but that she was taking hydrochlorothiazide and following a low-sodium diet, which improved the symptoms. (Tr. 35, 265-66, 1025).

The ALJ identified substantial evidence in the record in regards to the plaintiff's Meniere's disease which supported her RFC determination. The ALJ noted that the plaintiff's physical examinations were "generally unremarkable." (Tr. 34). Numerous tests–including

Romberg, headshake, and Fukuda tests–were all unremarkable and only showed hearing loss. (Tr. 35). The ALJ considered the evidence in the record and concluded that the plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible . . ." (Tr. 34); *See Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005) ("[C]redibility determinations are the province of the ALJ."). The plaintiff also challenges the ME's opinion because Dr. Farmati stated that he was not familiar with Tumarkin episodes, but Dr. Farmati did not dismiss the plaintiff's Meniere's disease symptoms. (DE# 23, 10/05/2017 at 22; Tr. 63). In the hearing, Dr. Farmati recommended that the plaintiff never be required to balance "due to the history of Meniere's disease." (Tr. 67). This recommendation was adopted in the ALJ's RFC which determined the plaintiff "can never balance." (Tr. 33). The ALJ's decision and the record show that the ALJ accounted for the plaintiff's Meniere's disease and accordingly limited the plaintiff to a range of sedentary work, "[i]n consideration to [the plaintiff's] allegations and the medical evidence of record." (Tr. 36).

Ultimately, the ALJ has "final responsibility" for deciding the claimant's RFC and a reviewing court may not re-weigh the evidence. 20 C.F.R. § 404.1527(d); *see also Martin*, 894 F.2d at 1529 ("Even if the evidence preponderates against the Secretary's factual findings, we must affirm if the decision reached is supported by substantial evidence."). The plaintiff has not submitted any persuasive evidence that the ALJ failed to consider all of the relevant medical and other evidence regarding Meniere's disease. 20 C.F.R. § 404.1545. To the extent that the ALJ did not fully credit all of the plaintiff's alleged statements regarding her symptoms, the ALJ may reasonably reject a claimant's subjective complaints if the ALJ adequately explains her reasons. *See Dyer v. Barnhart*, 395 F.3d 1206, 1212 (11th Cir. 2005); *See also Wilson v. Barnhart*, 284

F.3d 1219, 1226 (11th Cir. 2002) (noting that the "ALJ made a reasonable decision to reject [the claimant's] subjective testimony, articulating, in detail, the contrary evidence as his reasons for doing so"). The undersigned finds that the ALJ adequately considered the plaintiff's Meniere's disease in forming the RFC.

## B. The ALJ Failed to Properly Address the Plaintiff's Hearing Loss

The plaintiff argues that the ALJ failed to properly consider the plaintiff's hearing loss and failed to fully develop the record by declining to request a consultative examination of the plaintiff's hearing loss. (DE# 23, 10/05/2017 at 21). The defendant argues that the ALJ properly considered the plaintiff's hearing loss and there was substantial evidence showing that the plaintiff's hearing loss would not prevent her from working as a telemarketer. (DE# 24, 11/06/2017 at 13). The ALJ must "consider all [the claimant's] medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe." 20 C.F.R. § 404.1545; *See also* 20 C.F.R. § 404.1529 (The ALJ "will consider the impact of your impairment(s) and any related symptoms, including pain, on your residual functional capacity."). The ALJ " has a basic duty to develop a full and fair record." *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003); 20 C.F.R. § 416.912(d). However, the ALJ "is not required to order a consultative examination as long as the record contains sufficient evidence for the administrative law judge to make an informed decision." *Ingram*, 496 F.3d at 1269.

At the hearing, the plaintiff alleged that she was "completely deaf" in one ear and "borderline" in the other. (Tr. 52). As the plaintiff's motion details, there were inconsistencies in the ALJ's decision with respect to the plaintiff's hearing loss. For example, the ALJ noted in her

decision, "[t]here were no audiometric finding [sic] in the medical record." (Tr. 31). Then, in the

same opinion, the ALJ details audiometric results reviewed during an October 2012 doctor's

appointment:

> Dr. Lieberman pointed out that [the plaintiff] had had an audiogram done during
> that time that showed a left-sided hearing loss that was mild sloping to moderate
> sensorineural hearing loss. On the right side, she has a moderate-to-severe
> sensorineural hearing loss, and her SRT was 65 on the right side with 52%
> discrimination, 25% on the left side with 100% discrimination. (Tr. 35).

At step three of the evaluation process, the ALJ stated that there was "no specification of how

much hearing loss [the plaintiff] had." (Tr. 31). Then, at step four, the ALJ cited a June 22, 2015,

audiometric test, "which revealed her SRT was 60 on the right with 55% discrimination, and

25% on the left (Ex 26F at 5)." (Tr. 35). Similarly, the ALJ noted that "[a]lthough audiometric

testing was requested in August 2013, there is no indication that this was conducted or that the

claimant followed through." (Tr. 32). While it is accurate that on August 16, 2013 Dr. Parekh

requested an audiogram, he also assessed the plaintiff with asymmetrical sensorineural hearing

loss and noted that "[a]udio today shows left [sensorineural hearing loss] and mixed loss on

right." (Tr. 461). As discussed below, the ALJ also failed to include the plaintiff's hearing loss in

the hypothetical posed to the VE. A remand is appropriate to clarify these inconsistencies and

properly assess the plaintiff's hearing loss.

## C. The ALJ Failed to Include the Plaintiff's Hearing Loss in the Hypothetical to the VE

The ALJ found that the plaintiff's hearing loss was a severe impairment but she did not

include hearing loss in the hypothetical posed to the VE. (Tr. 29, 73-74). A VE's testimony "will

only constitute substantial evidence if the ALJ's hypothetical question includes all of the

claimant's impairments." *Denomme v. Comm'r, Soc. Sec. Admin.*, 518 F. App'x 875, 878 (11th

Cir. 2013); *See also Wilson*, 284 F.3d at 1227. However, an ALJ's error may be harmless and the decision will stand if "the correct application would not contradict the ALJ's ultimate findings." *Caldwell v. Barnhart*, 261 F. App'x 188, 190 (11th Cir. 2008); *See also Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983) (holding ALJ's factual error was harmless error and irrelevant because it did not effect ALJ's determination); *See also Himes v. Comm'r of Soc. Sec.*, 585 F. App'x 758, 761 (11th Cir. 2014) ("[E]ven if an ALJ made a factual error or applied an improper legal standard, we may find the errors harmless in light of the whole case.").

The plaintiff argues that the RFC determination was not based on substantial evidence because the ALJ committed a reversible error by failing to include hearing loss in the hypothetical. (DE# 23, 10/05/2017 at 25). The plaintiff cites *Dunaway v. Astrue,* where a district court held that the ALJ's failure to include hearing loss in the hypothetical constituted a reversible error "[b]ecause the ALJ found Plaintiff's hearing loss in his left ear to be a severe impairment but did not specify any functional limitations resulting from this impairment." *Dunaway v. Astrue*, No. 806-CV-1567-T-EAJ, 2008 WL 1897603, *7 (M.D. Fla. Apr. 28, 2008). The district court reversed the ALJ's decision in *Dunaway* because the ALJ did not include severe impairments in the hypothetical, "where the ALJ relied on that VE's testimony to make a disability determination." *Id.* at *5. The defendant concedes that the plaintiff had hearing loss but contends that "any error the ALJ made in not including hearing limitations in the RFC is harmless" because there was substantial evidence establishing that the plaintiff's hearing loss would not prevent her from working a telemarketer. (DE# 24, 11/06/2017 at 13). For example, the plaintiff's counsel at the ALJ hearing asked the VE whether "severe hearing loss in one of the two ears" would erode the occupational base or prevent the individual from working as a

telemarketer. (Tr. 74-75). The VE testified that "if they're able to hear and hold a conversation, I would say that person would still be able to maintain and do that previous occupation." (Tr. 75).

The ALJ in this matter determined that the plaintiff's hearing loss was a severe impairment but failed to include hearing loss in the hypothetical posed to the VE. In assessing the plaintiff's ability to perform past relevant work, the ALJ concurred with the VE's testimony "that a hypothetical individual with the same age, education, and experience as the claimant and who possessed the residual functional capacity set forth in paragraph five [of the ALJ's decision] would be able to perform the claimant's past work as a telemarketer." (Tr. 36-37). However, the ALJ's hypothetical to the VE did not include hearing loss. (Tr. 73-74). This Court cannot presume that the VE would have testified that the plaintiff was capable of performing past relevant work as a telemarketer if the ALJ had properly included the plaintiff's hearing loss in the hypothetical. *Pendley v. Heckler*, 767 F.2d 1561, 1563 (11th Cir. 1985) ("[W]e cannot assume that the vocational expert would have answered in a similar manner had the ALJ instructed him to consider all of the appellant's severe impairments."). While an ALJ is "not required to include findings in the hypothetical that the ALJ had properly rejected as unsupported," because the ALJ found the plaintiff's hearing loss was a severe impairment the ALJ erred by not including hearing loss in the hypothetical. *Crawford v. Comm'r Of Soc. Sec.*, 363 F.3d 1155, 1161 (11th Cir. 2004). Accordingly, a remand is appropriate for the ALJ to make a determination regarding the plaintiff's hearing loss and her ability to perform past relevant work based on all of the plaintiff's severe impairments. *See* 42 U.S.C. Section 405(g).

## <u>CONCLUSION</u>

Accordingly, it is

ORDERED AND ADJUDGED that the Defendant's Motion for Summary Judgment (DE# 24, 11/06/2017) is DENIED, the Plaintiff's Motion for Summary Judgment (DE# 24, 10/05/2017) is GRANTED, and this case is REMANDED to the ALJ for the reasons stated herein.

DONE AND ORDERED at the United States Courthouse, Miami, Florida this 6th day of July, 2018.

JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE

Copies provided to:
All counsel of Record